## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| CONSUMERS' RESEARCH, and BY TWO LP, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:21-cv-256-JDK |
| CONSUMER PRODUCT SAFETY COMMISSION, | § § § | |
| Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER

The Constitution vests all power—and responsibility—to execute the law in a single President.  Because this monumental responsibility is too great for any one person, the President must delegate power to subordinate officers.  For a century, the Supreme Court has recognized that this ability to delegate executive power implies a right to remove subordinates for any reason to ensure that "the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting 1 Annals of Cong. 499 (1789) (J. Madison)).

Here, Plaintiffs challenge a restriction on the President's power to remove members of the Consumer Product Safety Commission.  Plaintiffs argue that the restriction is unconstitutional because the Commission exercises substantial

executive power without proper presidential oversight.  For the reasons discussed below, the Court agrees.  Accordingly, Plaintiffs' Motion for Partial Summary Judgment as to Count I (Docket No. 14) is **GRANTED**.  The Government's Motion to Dismiss (Docket No. 24) is **DENIED** in part.  Additionally, finding no just reason for delay, the Court **GRANTS** Plaintiffs' request for entry of a partial final judgment under Federal Rule of Civil Procedure 54(b).

## I.

### A.

Plaintiffs are two educational organizations focused on product safety issues. Consumers' Research is a 501(c)(3) nonprofit organization that researches and publishes reports on policies, products, and services relevant to consumers.  Docket No. 1 ¶ 10.   Plaintiff By Two LP ("By Two") is a limited partnership that also researches consumer products.   Docket No. 1 ¶ 11.   The limited partnership is comprised of parents of young children who research children's products regulated by the Commission.  *Id.*

### B.

Defendant, the Consumer Product Safety Commission ("the Commission" or "CPSC"), is a federal agency charged with "protect[ing] the public against unreasonable risks of injury associated with consumer products."   15 U.S.C. §§ 2051(b)(1), 2053(a).   The Commission consists of five commissioners, each appointed by the President with the advice and consent of the Senate.  *Id.* § 2053(a). Each commissioner serves a seven-year term.  *Id.* § 2053(B)(1).  No more than three commissioners may be members of the same political party, and only an individual

with a "background and expertise in areas related to consumer products and protection of the public from risks to safety" is qualified to serve as a commissioner. *Id.* § 2053(a), (c).  Before the expiration of a seven-year term, the President may remove a commissioner "for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

Congress gave the Commission broad executive powers to regulate consumer products.  The Commission may promulgate binding regulations, initiate civil enforcement actions in district court, and conduct administrative adjudications.  *Id.* § 2056(a) (authorizing the Commission to "promulgate consumer product safety standards"); *id.* § 2076(b)(7)(A) (authorizing the Commission to bring civil actions to enforce "laws subject to its jurisdiction"); *id.* § 2076(a) ("The Commission may . . . conduct any hearing or other inquiry necessary or appropriate to its functions.").

## C.

Both Plaintiffs frequently request information relevant to their research and work from the Commission under the Freedom of Information Act ("FOIA").  Docket No. 1 ¶ 10–11.

"[T]he basic purpose of the Freedom of Information Act [is] 'to open agency action to the light of public scrutiny.'"  *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).  The Act mandates that every federal agency "shall make [requested] records promptly available to any person" who makes a proper request.  *See* 5 U.S.C. § 552(a)(3)(A).[1]  Every agency must promulgate regulations "specifying the schedule

---

[1] FOIA provides certain exemptions from disclosure, none of which is relevant in this case.  *See* 5 U.S.C. § 552(b).

of fees applicable to the processing of requests under" FOIA and "establishing procedures and guidelines for determining when such fees should be waived or reduced." *Id.* § 552(a)(4)(A)(i).  FOIA mandates that agencies provide fee waivers "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government." *Id.* § 552(a)(4)(A)(iii).

FOIA requests filed with the Commission are initially reviewed by FOIA officers, and denials are reviewed on administrative appeal by the Commission's General Counsel.  16 C.F.R. §§ 1015.4, .7.  After exhausting administrative remedies, requesters may challenge an agency's denial of records in district court.  5 U.S.C. § 552(a)(4)(B); *see also id.* § 552(a)(6)(A), (a)(6)(C)(i).

Pursuant to FOIA, the Commission adopted a rule ("the Final Rule") updating the fee schedule for CPSC FOIA requests in January 2021.  *See* Fees for Production of Records, 86 Fed. Reg. 7499-01, 7499 (Jan. 29, 2021) (to be codified at 16 C.F.R. pt. 1015).  The Final Rule increased the fees the Commission charges to duplicate, search for, and review requested documents.  *See id.* at 7500–01.  The Final Rule took effect on March 1, 2021.  *Id.* at 7499.

### D.

This case challenges the Commission's structure when it promulgated the Final Rule and as it processes Plaintiffs' FOIA requests.  Plaintiffs' claims are based on a series of FOIA requests they each filed with the Commission after the adoption of the Final Rule, as well as additional requests Plaintiffs expect to file in the future.

*Requests 277 and 278.*   On March 1, 2021, Plaintiff By Two filed FOIA Request 277 seeking records related to Bassettbaby Drop-Side Cribs and Request 278 seeking records related to Angel Line Longwood Forest Drop-Side Cribs.   Docket No. 14-1, Exs. E, H.  By Two included public interest fee waiver requests with both FOIA requests.  *Id.*  The Commission's FOIA officer denied the requests for fee waivers.  *Id.*, Exs. F, J.  In interim response letters dated September 22, 2021—after Plaintiffs filed both their complaint and partial motion for summary judgment and two days before the Government filed its motion to dismiss—the Chief FOIA officer informed By Two that, although the Commission had "not granted a public interest fee waiver," the Commission would not assess FOIA-request fees since the Commission had failed to respond within the twenty-day deadline.  Docket No. 24-1, Exs. 13, 14.

*Request 324.*   On March 22, 2021, By Two filed a FOIA request for several documents regarding American Society for Testing and Materials ("ASTM") voluntary safety standards and requested a public interest fee waiver.   Docket No. 14-1, Ex. K.  In response, the Commission did not provide any documents, but directed By Two to ASTM's website as a possible source of the requested documents.  *Id.*, Ex. L.  On administrative appeal, the Commission's General Counsel determined that the request was partially moot because the ASTM records could be obtained through third-party sources, but also partially remanded the request to determine whether the Commission possessed any records not otherwise publicly available and if "responsive records may be released."  *Id.*, Ex. N at 3.  In a December 2, 2021 letter,

after the parties had completed briefing on the pending motions, the Commission provided By Two physical copies of responsive ASTM records.  Docket No. 35-2, Ex. 2.

*Request 330.*  On March 23, 2021, Plaintiff Consumers' Research filed a FOIA request for several ASTM documents and requested a public interest fee waiver.  Docket No. 14-1, Ex. A.  As with By Two's Request 324, the Commission provided no documents, but directed Consumers' Research to ASTM's website.  *Id.*, Ex. B.  On administrative appeal, the Commission's General Counsel remanded the request to the FOIA officers with instructions to search for the documents and "determine whether these records may be released."  *Id.*, Ex. D at 7–8.  The Commission sent Consumers' Research a letter on December 2 stating that it could not locate any responsive records.  Docket No. 35-1, Ex. 1.

*Recent Requests.*  Both Plaintiffs plead that they are frequent FOIA requesters and will "submit additional FOIA requests and requests for fee waivers to the Commission in the future."  Docket No. 1 ¶¶ 10–11.  Between the filing of this lawsuit and Plaintiffs' motion for summary judgment, each Plaintiff has filed three additional FOIA requests.  *See* Docket No. 14-1, Exs. R–T, O–Q.  In response to the Government's motion to dismiss, Plaintiffs supplemented the record with seventeen pending requests filed between March 1, 2021, and October 18, 2021.  *See* Docket No. 29-1, Exs. OO–EEE.

### E.

Having exhausted their administrative appeals, Plaintiffs filed this suit on July 2, 2021.  Docket No. 1.  Plaintiffs allege informational injury and imminent financial injury due to the increased fee schedule to obtain documents responsive to

pending requests "and to obtain the documents they will request in the future." *Id.* ¶ 52; *see also id.* ¶ 51. Plaintiffs also seek to have their FOIA requests processed by a Commission properly structured under Article II of the U.S. Constitution. *See id.* ¶ 54.

Specifically, Plaintiffs plead three claims for relief. Under Count I, Plaintiffs seek to have the Court declare that the Commission's structure violates Article II and the separation of powers by insulating the commissioners from presidential removal. *Id.* ¶ 57–63. Under Count II, Plaintiffs ask the Court to set aside the Final Rule as contrary to a constitutional right under the Administrative Procedure Act. *Id.* ¶ 64–67. Finally, under Count III, Plaintiffs ask the Court to enjoin the Commission from enforcing the Final Rule or withholding documents pursuant to § 552(a)(4)(B) of the Freedom of Information Act, on the grounds that the Commission's actions are unlawful under Article II. *Id.* ¶¶ 68–78.

Plaintiffs now move for partial summary judgment as to Count I. Docket No. 14. Plaintiffs argue that whether Article II prevents the removal restriction on the commissioners is a purely legal question fit for review without further factual development and is a prerequisite finding to the claims in Counts II and III. *Id.* at 28–29. The Government filed a combined response and motion to dismiss. Docket No. 24. The Government does not argue that any material fact dispute precludes partial summary judgment, but instead contends that Plaintiffs are wrong on the law. The Government also moves to dismiss all three Counts for lack of subject matter

jurisdiction and for failure to state a claim. *Id*. The Court heard oral argument on the motions on December 15, 2021. Docket No. 38.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 323–25 (1986). Under Rule 12(b), dismissal is proper for "lack of subject-matter jurisdiction" and "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(1), (6). For the reasons discussed below, the Court **GRANTS** Plaintiffs' motion for partial summary judgment and **DENIES** in part the Government's motion to dismiss.

## II.

The Government argues that Plaintiffs lack standing because they "have not suffered any concrete injury." Docket No. 24 at 10. The Government also contends that Plaintiffs' claims are moot because the Commission has produced some of the requested records. Docket No. 35 at 2. As explained below, the Court concludes that Plaintiffs have alleged several distinct injuries and that Plaintiffs' claims are not moot.

### A.

"[A]n essential and unchanging part of the case-or-controversy requirement of Article III" is that the plaintiff has standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing requires a plaintiff to show that: (1) he "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent,

not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *El Paso Cnty. v. Trump*, 982 F.3d 332, 337 (5th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  "The party invoking federal jurisdiction bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.*

Here, Plaintiffs allege several distinct injuries, each of which satisfies Article III standing.

*First*, Plaintiffs allege informational injuries resulting from the Commission's withholding of documents to which Plaintiffs claim entitlement under FOIA.  Docket No. 1 ¶ 51.  As the Government concedes, Plaintiffs had standing when they filed the complaint to challenge the initial decision to deny their ASTM requests.  *See* Docket No. 24 at 17 n.7.  Further, although the Commission has since produced some of those records, the Government concedes that it has yet to release documents responsive to Requests 277 and 278.  *See* Docket No. 37 at 2.  "The agency's failure to provide information to which the Requesters are statutorily entitled is a quintessential form of concrete and particularized injury within the meaning of Article III." *Maloney v.*

*Murphy*, 984 F.3d 50, 59 (D.C. Cir. 2020); *see also Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 429 (5th Cir. 2013) ("This is the kind of concrete informational injury that the statute was designed to redress.").

*Second*, Plaintiffs allege the increased fees under the Final Rule cause financial injury.  Docket No. 1 ¶ 52.  The Final Rule raised the fee for print duplications from $0.10 per page to $0.15 per page.  Fees for Production of Records, 86 Fed. Reg. 7499-01, 7500 (Jan. 29, 2021) (to be codified at 16 C.F.R. pt. 1015); *see also* 16 C.F.R. § 1015.9(e)(1).  And it increased search and review fees from rates between $3.00–$4.90 per quarter-hour to rates between $10.31–$15.11 per quarter-hour, to be adjusted annually.  86 Fed. Reg. at 7500–01; 16 C.F.R. § 1015.9(e)(2)–(3); *see also* UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION, *FOIA Fees*, https://www.cpsc.gov/Newsroom/FOIA/FOIA-Fees.  "[T]hat sort of pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *see also McGowan v. Maryland*, 366 U.S. 420, 424, 430–31 (1961) (holding plaintiffs had standing to challenge a $5.00 fine).  The Government claims "Plaintiffs did not plead any injury from the imposition of search and review fees." Docket No. 31 at 2 n.2 (citing Docket No. 1 ¶ 52).  But the complaint cites 16 C.F.R. § 1015.9(e)(2) and (3) as injurious alongside § 1015.9(e)(1).  Docket No.1 ¶ 52; *see also id.* ¶ 31.

The Government also argues that Plaintiffs have not "been assessed increased fees under the Final Rule." Docket No. 24 at 11.  But it is undisputed that at the time of filing, the Commission's FOIA officer had denied By Two's request for fee waivers

and both Plaintiffs' requests for ASTM documents.  Docket No. 1 ¶¶ 36, 39–43; *see also* Docket No. 24 at 17 n.7 (conceding standing to challenge initial decisions).  The Commission's initial denial of fee waivers created an immediate threat of paying the fees.  And the Commission's initial denial of the requests for ASTM documents forced Plaintiffs to choose between going without the information or paying third parties for the documents at higher rates.  Docket No. 1 ¶¶ 36, 39–43; *see also, e.g.*, Docket No. 14-1, Ex. V.  Thus, when Plaintiffs filed the complaint, their injury was "certainly impending."  *See McCardell v. HUD*, 794 F.3d 510, 519 (5th Cir. 2015) (finding injury to be certainly impending when "the chain-of-events framework . . . involves few[] steps and no 'unfounded assumptions.'"); *Loa-Herrera v. Trominski*, 231 F.3d 984, 987 (5th Cir. 2000) ("In identifying an injury that confers standing, courts look exclusively to the time of filing.").[2]

Plaintiffs also repeatedly allege they suffer an ongoing injury by facing future liability for the increased FOIA fees.  The complaint is replete with details alleging that Plaintiffs have an established history of filing FOIA requests with the Commission and have specific plans to do so again in the future.  *See, e.g.*, Docket No. 1 ¶¶ 10–11, 52 (alleging "imminent financial injury" from the increased cost "to obtain the documents they will request in the future").  Indeed, as the summary judgment record indicates, Plaintiffs have filed additional FOIA requests with the

---

[2] The Government's argument that Plaintiffs should be required to pay the increased fees before challenging the legality of the Final Rule, Docket No. 31 at 4, rests on a line of cases evaluating *ripeness* for purposes of a FOIA policy-or-practice challenge.  *See, e.g.*, *Media Access Project v. F.C.C.*, 883 F.2d 1063, 1070 (D.C. Cir. 1989) (holding challenge "not ripe for review.").  The Government's motion to dismiss nowhere argues that this case is unripe for judicial review.  *See* Docket No. 24 at 10–11.

Commission since this suit began.  *See* Docket No. 14-1, Exs. O–T.  Far from being

"'some day' intentions," Plaintiffs' habitually engaging in the regulated conduct at

issue in this case demonstrates the concrete plans necessary to establish an injury in

fact.  *See Ghedi v. Mayorkas*, 16 F.4th 456, 465 (5th Cir. 2021) (quoting *Lujan*, 504

U.S. at 564).

      *Third*, Plaintiffs allege an ongoing constitutional injury by pleading that they

remain subject to regulations promulgated by an unconstitutionally structured

agency.    Docket  No. 29  at  7–8;  Docket  No. 1  ¶¶  1–3,  10–12,  26–34.    The

Supreme Court has held that parties alleging such injury have standing to challenge

removal restrictions "because when such a provision violates the separation of powers

it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a

court."  *Seila L. L.L.C. v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (quoting *Bowsher v.

Synar*, 478 U.S. 714, 727 n.5 (1986)).

      Further, "'there is ordinarily little question' that a regulated individual or

entity has standing to challenge an allegedly illegal statute or rule under which it is

regulated."  *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015)

(quoting *Lujan*, 504 U.S. 561–62).   "Whether someone is in fact an object of a

regulation is a flexible inquiry rooted in common sense."  *Contender Farms, L.L.P. v.

U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015).   Here, in promulgating the

Final Rule, the Commission acted directly on Plaintiffs' statutory entitlement to

obtain information and claim fee waivers now and in the future.  *See* 16 C.F.R.

§ 1015.9(e); *see also id.* § 1015.9(g)(1)(iv).  Subjecting Plaintiffs to such regulation in

the alleged absence of Article II oversight directly injures Plaintiffs. *See Cochran v. SEC*, 20 F.4th 194, 209 (5th Cir. 2021) (recognizing a standalone injury creating a right to seek "redress for the injury of having to appear before" a constitutionally suspect agency).

The Government's myriad objections to this constitutional injury ignore the fact that Plaintiffs allege they are frequently subject to the Final Rule. A regulated party may object to the existence of a regulation that may otherwise be a generalized grievance. *See Contender Farms*, 779 F.3d at 264–65 (noting that subjects of regulations generally have standing to challenge the rule or statute). Further, the fact that Plaintiffs choose to subject themselves to FOIA regulations is immaterial because, as explained above, FOIA requests are a common and habitual part of Plaintiffs' business models. *See id.* at 266 ("[Plaintiffs] suggest that they could neither earn a living nor compete recreationally without participating in these events."); *cf. Cochran*, 20 F.4th at 209–10 ("Cochran challenges the entire legitimacy of her proceedings, not simply the cost and annoyance."). Accordingly, Plaintiffs have alleged a constitutional injury from the threat of being subject to a regulatory scheme and governmental action lacking Article II oversight. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010) (recognizing petitioner's right to be regulated only by "a constitutional agency accountable to the Executive").

\*     \*     \*

In sum, the Court finds that Plaintiffs have pleaded a concrete and imminent injury in fact and that the summary judgment record establishes that this injury is

ongoing.  Further, Plaintiffs have demonstrated the injuries caused by processing FOIA requests under the Final Rule are traceable to the Commission's conduct and that the Court can redress these injuries with a declaration that the removal restriction is unconstitutional or by setting aside the Final Rule.  *See* Docket No. 1 ¶¶ 53–54; Docket No. 29 at 8–10.[3]  Plaintiffs therefore have standing.

## B.

In notices filed post briefing, the Government contends that its release of records responsive to Requests 324 and 330 moots the case.  *See* Docket No. 35.[4] Typically, a FOIA request becomes moot once it is resolved.  *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 490–91 (D.C. Cir. 1988).  Here, however, Plaintiffs' claims are not limited to Requests 324 and 330.  Plaintiffs also challenge the Commission's Final Rule and plead ongoing injuries based on pending and future FOIA requests.  *See* Docket No. 1 ¶¶ 10–11, 52.  The release of specific records therefore does not moot the case.  *See Payne Enterprises*, 837 F.2d at 491 (holding

---

[3] The Government also argues that, to obtain relief, Plaintiffs must show that the Commission's actions are traceable directly to the removal restriction in § 2053(a).  *See* Docket No. 24 at 11–17. But the Government correctly frames this requirement as implicating the Plaintiffs' ability to state a claim on which relief may be granted, not the traceability element of standing.  *See Collins*, 141 S. Ct. at 1788 n.24 ("What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction.").  To show traceability for purposes of standing, "the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged."  *Id.* at 1779 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  Plaintiffs easily meet this requirement, and the Court addresses below whether Plaintiffs have stated a claim to which they are entitled to relief.

[4] The Government does not claim the Commission has produced documents responsive to Requests 277 and 278, but merely that the Commission has approved the requests and that the proper course is to allow the Commission more time to review the records.  *See* Docket No. 37 at 2. Far from mooting the case, this development would at most justify an amended scheduling order. *See, e.g., Huddleston v. FBI*, 2021 WL 327510, at *3 (E.D. Tex. Feb. 1, 2021) (denying motion to stay but extending scheduling order deadlines).

that a release of documents "will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future").

## III.

Plaintiffs contend that the removal restriction in 15 U.S.C. § 2053(a) is unconstitutional because the commissioners are executive officers wielding substantial executive power.  Docket No. 14 at 11–26.  The Government contends that the Supreme Court has "uniformly affirmed" that removal restrictions on multimember agencies like the Commission are constitutional.  *See* Docket No. 24 at 17.

As explained below, the Court holds that the restriction on the President's power to remove the commissioners violates Article II.

## A.

Article II states: "The executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 1, cl. 1; *id*., § 3.  Unlike Article I, which vests the legislative power in a multibody Congress, Article II vests in a single President not "*some of* the executive power, but *all of* the executive power." *Morrison v. Olson*, 487 U.S. 654, 705 (1988) (Scalia, J., dissenting); *see also Seila Law*, 140 S. Ct. at 2191 ("[T]he 'executive Power'—all of it—is 'vested in a President.'").  Of course, "it would be impossible for one man to perform all the great business of the State," so "the Constitution assumes" the President will delegate much of his responsibility to officers under his command.  *Seila Law*, 140 S. Ct. at 2197 (cleaned up) (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)).

These officers "must remain accountable to the President, whose authority they wield." *Id.* As the first Congress recognized: "If any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Id.* (cleaned up) (quoting 1 Annals of Cong. 463 (1789)). "Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. Indeed, without the power to remove inferior officers in whom the President has lost faith, it would be "impossible for the President to take care that the laws be faithfully executed." *Seila Law*, 140 S. Ct. at 2198 (cleaned up) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).

Limiting the President's removal power insulates executive officers from accountability—both to the President and the governed. If the removal power is restricted, the President "can neither ensure that the laws are faithfully executed, nor be held responsible for [executive officers'] breach of faith." *Free Enter. Fund*, 561 U.S. at 496. Such officers "would be immune from Presidential oversight, even as they exercised power in the people's name." *Id.* at 497. They would also be unaccountable to the people, who "do not vote for the 'Officers of the United States.'" *Id.* at 497–98 (quoting U.S. CONST. art. II, § 2, cl. 2). "That is why the Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Id.* at 498 (quoting 1 Annals of Cong., at 499 (J.

Madison)); *accord Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019) (opinion of Kagan, J.) ("[A]gencies . . . have political accountability, because they are subject to the supervision of the President, who in turn answers to the public.").

This fundamental first principle is as critical today as it was in 1789. The Supreme Court has rejected the argument that "the times demand" limiting the President's removal power "in the interest of enhancing independence from politics in regulatory bodies." *See Seila Law*, 140 S. Ct. at 2206 n.11; *id.* at 2226 (Kagan, J., dissenting in part and concurring in judgment with respect to severability). "If anything, the growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, *heightens* the concern that it may slip from the Executive's control, and thus from that of the people." *Id.* at 2206 n.11 (majority opinion) (cleaned up) (quoting *Free Enter. Fund*, 561 U.S. at 499). Thus, the "general rule" is that "the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Id.* at 2198 (quoting *Free Enter. Fund*, 561 U.S. at 513–14).

Indeed, "the President's removal power is the rule, not the exception." *Id.* at 2206. And the exceptions are narrow and limited—with the Supreme Court recognizing only two. *Id.* at 2199–200. One, stated in *Morrison v. Olson*, 489 U.S. 654 (1988), allows removal restrictions on "inferior officers with limited duties and no policymaking or administrative authority." *Id.* The other, recognized in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), allows removal restrictions on members of "multimember expert agencies that do not wield

substantial executive power." *Id.* "These two exceptions . . . 'represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power.'" *Id.* (quoting *PHH Corp. v. CFBP*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

The parties agree that the *Morrison* exception is inapplicable. Here, the commissioners shielded from removal by 15 U.S.C. § 2053(a) are principal, rather than inferior, officers under the Appointments Clause, and hold significant policymaking and administrative authority. *See Free Enter. Fund*, 561 U.S. at 510–11 (citing *Freytag v. Comm'r*, 501 U.S. 868, 915 (1991) (Scalia, J., concurring in part and concurring in judgment)); *see also, e.g.*, 15 U.S.C. § 2051(b).

This case therefore turns on the *Humphrey's Executor* exception.

## B.

Plaintiffs argue that *Humphrey's Executor* does not apply here because the Commission exercises substantial executive power, unlike the agency in that case. Docket No. 14 at 20. The Government counters that the exception applies to any multimember, nonpartisan structure regardless of function and power. Docket No. 24 at 18–22. Based on nearly a century of precedent, the Court holds that the *Humphrey's Executor* exception does not apply to the Commission.

## 1.

*Humphrey's Executor* involved the Federal Trade Commission ("FTC"), a commission of five members appointed by the President with the advice and consent of the Senate. 295 U.S. at 619–20. By statute, no more than three of the commissioners could be members of the same political party. *See id.* And each

member's term was staggered to ensure new vacancies for the President to fill each presidential term.  *See id*. at 620.  Congress created the commission as a "body of experts who shall gain experience by length of service; a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government."   *Id*. at 625–26.   Accordingly, the President could remove commissioners only "for inefficiency, neglect of duty, or malfeasance in office."  *Id*. at 620.

The Supreme Court upheld the removal restriction.  The Court reasoned that the FTC "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute . . . and to perform other specified duties as a legislative or as a judicial aid."  *Id*. at 628.  "Such a body cannot in any proper sense be characterized as an arm or an eye of the executive."  *Id*.  In performing its statutory duties, the FTC "acts in part quasi legislatively and quasi judicially."  *Id*.  The commission "acts as a legislative agency" when it investigates and reports to Congress, and "it acts as an agency of the judiciary" when it serves as a master in chancery under court procedures.  *Id*.

The Court also distinguished the FTC from the postmaster at issue in *Myers v. United States*, 272 U.S. 52 (1926), in which the Court had held that the President's removal power could not be restricted.  *See Humphrey's Executor*, 295 at 627–28.  The postmaster in *Myers* was "an executive officer restricted to the performance of executive functions," "charged with no duty at all related to either the legislative or

judicial power"—and was therefore "so essentially unlike the [FTC]" that *Myers* was inapplicable.  *Id*. at 627.  "[S]uch an officer is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive."  *Id*.  The FTC, in contrast, was "created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments."  *Id*. at 630.

Since 1935, the Supreme Court has upheld removal restrictions under the *Humphrey's Executor* exception only once—for the almost purely adjudicatory War Claims Commission established after the Second World War.  *See Wiener v. United States*, 357 U.S. 349, 354–55 (1958) ("The Commission was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof.").  Instead, the Court has repeatedly refused to apply the exception to various bodies exercising executive power.

In *Free Enterprise Fund*, the Court held that *Humphrey's Executor* could not save restrictions on removing officers who "determine[] the policy and enforce[] the laws of the United States."  561 U.S. at 484.  *Free Enterprise Fund* involved the Public Company Accounting Oversight Board, a board of five members appointed to staggered five-year terms by the Securities and Exchange Commission.  *See id*.  Congress "created the Board as a private 'nonprofit corporation,'" empowered it to enforce securities laws, and placed it under the SEC's oversight.  *Id*. at 484–86.  By statute, the SEC could not "remove Board members at will, but only 'for good cause shown.'"  *Id*. at 486.  The Court held that this "arrangement [was] contrary to

Article II's vesting of the executive power in the President." *Id*. at 496.  Unlike *Humphrey's Executor*, which did not involve an executive officer, the Board members were "Officers of the United States" executing significant executive authority. *See id*. at 486, 493.  And the governing statute "not only protects Board members from removal except for good cause, but [it] withdraws from the President any decision on whether that good cause exists." *Id*. at 495.  "That [removal] decision is vested instead in . . . the [SEC] Commissioners—none of whom is subject to the President's direct control." *Id*. at 496.

A decade later, the Court in *Seila Law* again refused to extend the *Humphrey's Executor* exception—this time to "an independent agency led by a single Director and vested with significant executive power."  140 S. Ct. at 2201.  The agency was the Consumer Financial Protection Bureau, a regulatory agency tasked with implementing and enforcing consumer protection laws, conducting investigations, prosecuting civil actions in federal court, and exercising adjudicatory authority. *See id*. at 2193.  Rather than creating "a traditional independent agency headed by a multimember board or commission," however, Congress placed the Bureau under the leadership of a single Director. *Id*.  The Director is appointed by the President for a term of five years but may be removed only for "inefficiency, neglect of duty, or malfeasance in office." *Id*.

In holding this removal restriction unconstitutional, the Court distinguished the Bureau from the FTC in *Humphrey's Executor*.  Unlike the FTC, the Bureau "is led by a single Director who cannot be described as a 'body of experts' and cannot be

considered 'non-partisan.'" *Id.* at 2200.   FTC commissioners, moreover, served staggered terms "prevent[ing] complete turnovers in agency leadership," while the Director's five-year term would "guarantee abrupt shifts in agency leadership and with it the loss of accumulated expertise." *Id.* Further, the Director "is hardly a mere legislative or judicial aid," but rather, "possesses the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy." *Id.* The Director may "unilaterally issue final decisions . . . in administrative adjudications" and exercises "a quintessentially executive power"—enforcing monetary penalties—that was "not considered in *Humphrey's Executor*." *Id.* Lingering on this last point, the Court emphasized that whether the 1935 FTC possessed other "latent powers" was irrelevant: "what matters is the set of powers the Court considered as the basis for its decision." *Id.* at 2200 n.4.

Finally, last year the Court held in *Collins v. Yellen*, that *Humphrey's Executor* did not save a removal restriction on the Director of the Federal Housing Finance Agency ("FHFA"). 141 S. Ct. at 1770.   "*Seila Law* is all but dispositive." *Id.* at 1783. Like the Bureau in *Seila Law*, the FHFA is tasked with "broad investigative and enforcement authority" and may hold hearings, issue subpoenas, remove or suspend corporate officers, issue cease-and-desist orders, and bring civil actions in federal court. *Id.* at 1772. Also like the Bureau, the FHFA "is an agency led by a single Director," and the statute "restricts the President's removal power." *Id.* at 1784. The removal restriction was thus unconstitutional, even if the FHFA exercised less

22

executive power than the Director of the Bureau in *Seila Law*.  *See id.* at 1785 ("Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry.").

In sum, the Supreme Court has applied the *Humphrey's Executor* exception only twice—in *Humphrey's Executor* and *Wiener*, where the multimember commissions did not exercise substantial executive power.

## 2.

Turning to this case, the Court concludes that the Commission exercises substantial executive power and therefore does not fall within the *Humphrey's Executor* exception.

Similar to the Bureau in *Seila Law*, the Commission "may promulgate consumer product safety standards" affecting a wide range of consumer products on the market.  15 U.S.C. § 2056(a); *Seila Law*, 140 S. Ct. at 2200 (noting the Bureau's "authority to promulgate binding rules fleshing out 19 federal statutes.").  And just as the Bureau had the power to regulate certain practices across a segment of the U.S. economy, the Commission has the authority to "promulgate a rule" banning products nationwide as "hazardous."  15 U.S.C. § 2057; *see also* 140 S. Ct. at 2200 (noting a broad power to issue "prohibition on unfair and deceptive practices in a major segment of the U.S. economy").  At oral argument, the Government conceded this authority was an executive power.  *See* Docket No. 41 at 55:10–13.

23

The Commission also holds the power to "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *See* 140 S. Ct. at 2200. Indeed, the Commission "by one or more of its members" may "conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States." 15 U.S.C. § 2076(a); *see also* 16 C.F.R. § 1025.1 (establishing rules for adjudication). And as the Supreme Court said in *Seila Law*, agency adjudication in this form "*must be*" an exercise of executive authority. 140 S. Ct. at 2198 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013)).

Finally, the Commission holds the "quintessentially executive power not considered in *Humphrey's Executor*" to file suit in federal court "to seek daunting monetary penalties against private parties" as a means of enforcement. *Seila Law*, 140 S. Ct. at 2200; *see also* 15 U.S.C. § 2076(b)(7)(A) (authorizing the Commission to initiate and prosecute civil actions). Each violation of the Commission's rules carries "a civil penalty not to exceed $100,000," up to a total of $15 million for all related violations, with the ability to adjust for inflation. 15 U.S.C. § 2069(a)(1); (a)(3)(A). The Commission may also bring actions for injunctive enforcement in district court. *Id.* § 2071(a). And the Commission can initiate and prosecute criminal actions "with the concurrence of the Attorney General." *Id.* § 2076(b)(7)(B). Finally, the Commission has the power to issue subpoenas, *see id.* § 2076(b)(3), an additional executive power recognized in *Collins*. *See* 141 S. Ct. at 1786.

The Government does not dispute that these are executive powers. Rather, the Government argues that the 1935 FTC may have exercised similar powers. *See*

Docket No. 24 at 24–25.  This argument was raised by the dissenting Justices in *Seila Law* and rejected by a majority of the Court.  *See* 140 U.S. at 2200 n.4; *id.* at 2239 n.10 (Kagan, J., dissenting in part and concurring in judgment with respect to severability).  Here, the Court must consider "the set of powers the [Supreme] Court considered as the basis for its decision" in *Humphrey's Executor*, and "not any latent powers that the agency may have had not alluded to by the Court."  *Id.* at 2200 n.4 (majority opinion).

The Court thus concludes that the Commission exercises substantial executive power, and *Humphrey's Executor* does not apply.

## 3.

The Government argues that the removal restriction in § 2053(a) is nonetheless constitutional because the Commission's "structure is in all material respects identical to the FTC's structure the Supreme Court unanimously upheld in *Humphrey's Executor*."  Docket No. 24 at 18.  The Government contends that this "structure"—with five members serving staggered seven-year terms—is a "Congressionally crafted and constitutionally permissible" expert agency whose officers may be removed by the President only for good cause.  *Id.* at 19.  The Government, however, ignores a significant basis of the Supreme Court's holding in *Humphrey's Executor*—that the FTC exercised "no part of the executive power."  295 U.S. at 628.

To be sure, *Humphrey's Executor* discussed the multimember structure of the FTC in addressing the removal restriction.  295 U.S. at 624–26.  But the Court later

explained in *Seila Law* that identifying these "organizational features . . . helped explain its characterization of the FTC as non-executive."  140 S. Ct. at 2198; *see id.* at 2199 (noting that these features demonstrated that the FTC's duties "were neither political nor executive" (quoting *Humphrey's Executor*, 295 U.S. at 624)).  The fact that an agency is structured as a nonpartisan "body of experts" is a necessary *indication* that the agency does not wield executive power.  *See Humphrey's Executor*, 295 U.S. at 628.  But nowhere did the Court state that all multimember commissions with similar attributes may be protected from presidential removal—regardless of their authority and function.  To the contrary, the Court expressly left "for future consideration and determination" whether removal restrictions could be placed on officers who occupied the "field of doubt" between "purely executive officers" and those who filled "an office such as that here involved."  *Id.* at 632; *accord Seila Law*, 140 S. Ct. at 2199 ("The Court acknowledged that between purely executive officers on the one hand, and officers that closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left 'for future consideration.'").

The Government also attempts to distinguish *Seila Law* and *Collins* as cases involving agencies "led by a single Director," not multimember commissions.  Docket No. 24 at 22–23 (quoting *Collins*, 141 S. Ct. at 1784).  According to the Government, the Supreme Court in *Seila Law* indicated that Congress could have imposed the removal restriction in that case simply by "converting the [Bureau] into a multimember agency."  *Id*. at 21 (emphasis removed) (quoting *Seila Law*, 140 S. Ct. at 2211).  But that is not what the Court said.  Rather, in addressing severability, the

Court noted in dictum that one remedy to the removal-restriction problem "may be" "converting the CFPB into a multimember agency." *Seila Law*, 140 S. Ct. at 2211. The Court did not hold that Congress could create multimember agencies wielding substantial executive power and then restrict the President's power to remove their members. *See id.*

Rather, in each of the removal cases discussed above, the Supreme Court relied on first principles. Article II vests the executive power in the President, who must "take Care that the Laws be faithfully executed." *See, e.g.*, *Humphrey's Executor*, 295 U.S. at 627 (citing the "illimitable power of removal by the Chief Executive."); *Free Enter. Fund*, 561 U.S. at 492 (citing the Take Care Clause); *Seila Law*, 140 S. Ct. at 2197 (same). The President cannot effectively fulfill that duty when Congress restricts his removal power. *Myers*, 272 U.S. at 164 ("[T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."); *Free Enter. Fund*, 561 U.S. at 492 (same); *Seila Law*, 140 S. Ct. at 2197 (same). Thus, an unrestricted removal power is "the general rule." *Seila Law*, 140 S. Ct. at 2198; *see also Free Enter. Fund*, 561 U.S. at 513–14. And the *Humphrey's Executor* exception applies only to multimember commissions that do not exercise substantial executive authority—and thus do not interfere with the President's duty to "take care that the laws be faithfully executed." *See Humphrey's Executor*, 295 U.S. at 628; *Wiener*, 357 U.S. at 354–55.

The Government also argues that the Commission and other "similarly structured agencies . . . . are longstanding and accepted pillars of American

governance." Docket No. 24 at 17. But Article II of the Constitution demands that agencies exercising executive authority be fully accountable to the President, and the Constitution remains the supreme law of the land. *See* U.S. CONST. art. II, § 1, cl. 1; *id*., § 3; *id.* art. VI § 2; *see also I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."). Indeed, as the Supreme Court explained in rejecting a similar argument, "[w]hile no one doubts Congress's power to create a vast and varied federal bureaucracy, the expansion of that bureaucracy into new territories that the Framers could scarcely have imagined only sharpens our duty to ensure that the Executive Branch is overseen by a President accountable to the people." *Seila Law*, 140 S. Ct. at 2207 (cleaned up) (quoting *Free Enter. Fund*, 561 U.S. at 499).

*     *     *

"The President's removal power is the rule, not the exception." *Seila Law*, 140 S. Ct. at 2206; *see also Free Enter. Fund*, 561 U.S. at 483; *Myers*, 272 U.S. at 164. The Court may uphold a restriction on that removal power in only two limited situations. *See Seila Law*, 140 S. Ct. at 2199–200; *see also Morrison*, 487 U.S. at 691; *Humphrey's Executor*, 295 U.S. at 632. Neither is present here. Accordingly, the Court holds that the restriction on presidential removal established by 15 U.S.C. § 2053(a) violates Article II of the U.S. Constitution.

<h2 style="text-align:center">IV.</h2>

The Court now turns to the remedy. Plaintiffs seek a declaratory judgment that the removal restriction in 15 U.S.C. § 2053(a) violates Article II of the

Constitution.  Docket No. 1, Prayer for Relief ¶¶ 1–2; *see also* Docket No. 14 at 29.  The Government argues that Plaintiffs are not entitled to this relief because (1) they cannot show that the removal restriction caused them harm and (2) a declaratory judgment is improper here.  Docket No. 24 at 11–17, 28–32.  As explained below, the Government's arguments fail.

### A.

Citing *Collins v. Yellen*, the Government contends that Plaintiffs may not "obtain relief for their alleged injuries" unless they identify a "plausible nexus" between the removal restriction in § 2053(a) and the decisions regarding their FOIA requests and the adoption of the Final Rule.  *See* Docket No. 24 at 11–13 (citing *Collins*, 141 S. Ct. at 1789).  But *Collins* applies to requests for retrospective relief, not the purely prospective relief Plaintiffs seek in Count I here.

In *Collins*, plaintiff shareholders of Fannie Mae and Freddie Mac sought to rescind a stock purchasing agreement (known as the third amendment) between the Federal Housing Finance Agency ("FHFA") and the Department of Treasury.  141 S. Ct. at 1772–75.  The shareholders argued that recission of the third amendment would also require the disgorgement of dividend payments worth billions of dollars.  *Id.*  By the time the case reached the Supreme Court, however, the third amendment had been repealed.  *Id.* at 1779–80.  "And because the shareholders no longer ha[d] a live claim for prospective relief, the only remaining remedial question concern[ed] retrospective relief."  *Id.* at 1787 (citation omitted).  The Court held that the shareholders were not entitled to such retrospective relief without demonstrating that the removal restriction "inflict[ed] compensable harm"—by, for example,

preventing the President from removing a Director who supervised the implementation of the third amendment.  *Id.* at 1787–89.[5]

*Collins* does not address requests for prospective relief.  Instead, *Free Enterprise Fund* governs.  In that case, the Supreme Court squarely held that plaintiffs challenging removal restrictions could obtain declaratory relief *without* demonstrating the restrictions inflicted "compensable harm" or identifying a "plausible nexus" between the restrictions and the challenged action.  *See* 561 U.S. at 513; *see also id.* at 491 n.2.  The Court stated:  "[Petitioners] are entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive."  *Id.* at 513.  This type of equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally."  *Id.* at 491 n.2 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

Indeed, the Fifth Circuit held in *Cochran v. SEC* that *Collins* does not apply to plaintiffs seeking prospective relief.  *See* 20 F.4th at 210 n.16 ("*Collins* does not impact our conclusion in this case because Cochran does not seek to 'void' the acts of any SEC official.  Rather, she seeks an administrative adjudication untainted by separation-of-powers violations.").

---

[5]  The Supreme Court remanded *Collins* to the Fifth Circuit to determine if the shareholders suffered such harm.  The Fifth Circuit, in turn, remanded to the district court "for further proceedings consistent with the Supreme Court's decision."  *Collins v. Yellen*, No. 17-20364, 2022 WL 628645, at *1 (5th Cir. Mar. 4, 2022).

Accordingly, the Court denies the Government's motion to dismiss the claims seeking prospective relief.[6]

## B.

Next, the Government argues that Plaintiffs are not entitled to a declaratory judgment because they lack a "private cause of action" and because the "requested declaratory relief would not remedy [Plaintiffs'] injuries."  Docket No. 24 at 28–32. The Court disagrees on both points.

## 1.

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Of course, "the law makes clear that—although the Declaratory Judgment Act provides a *remedy* different from an injunction—it does not provide an additional cause of action with respect to the underlying claim."  *Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001) (en banc).  Here, Plaintiffs seek a declaratory judgment on Count I, which alleges "an implied private right of action directly under the Constitution to challenge governmental action under" *Free Enterprise Fund* and separation-of-powers principles.  Docket No. 1, Count I, ¶ 57 (quoting *Free Enter. Fund*, 561 U.S. at 491 n.2).

---

[6]  The Government moves to dismiss Plaintiffs' entire complaint, including Counts II and III, which also seek retrospective relief.  *See* Docket No. 24 at 11.  The Court declines to address this argument at this time because (1) Plaintiffs have moved for partial summary judgment only on Count I and the request for prospective declaratory relief and (2) the Fifth Circuit has yet to clarify the requirements for obtaining retrospective relief post-*Collins*.

As noted above, *Free Enterprise Fund* held that plaintiffs challenging the removal restriction on Public Company Accounting Oversight Board members were entitled to a declaratory judgment to ensure that "the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." 561 U.S. at 513. There, as here, the Government argued that the plaintiffs lacked a private right of action to challenge a removal restriction under "the Appointments Clause or separation-of-powers principles." *Id*. at 491 n.2. The Supreme Court rejected the argument, holding that it has long recognized a right of action to challenge unconstitutional governmental action and that there was "no reason" why "an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim." *Id*.

The Government argues that the right of action recognized in *Free Enterprise Fund* is available only to plaintiffs facing a civil or criminal enforcement action.[7] Docket No. 24 at 29–30. But *Free Enterprise Fund* is not so limited. Rather, the Court held that the right of action extends generally to those challenging "governmental action under . . . separation-of-powers principles." 561 U.S. at 491 n.2; *see also Collins v. Mnuchin*, 938 F.3d 553, 587 & n.227 (5th Cir. 2019) (en banc) ("A

---

[7] The Government also argues that the Court should be "hesitant" to find new implied causes of action, especially when the APA and FOIA provide a remedy for Plaintiffs' injuries. Docket No. 24 at 30. But this cause of action is not new. *See Free Enter. Fund*, 561 U.S. at 491 n.2; *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 496–97 (5th Cir. 2020) (Oldham, J., concurring) ("[I]n more recent years, the Court has reaffirmed this cause of action as accepted fact."); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("These concerns [about creating a cause of action] are even more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief.").

plaintiff with Article III standing can maintain a direct claim against government action that violates the separation of powers.") (citing *Free Enter. Fund*, 561 U.S. at 487–91), *aff'd in part and vacated and rev'd in part on other grounds*, 141 S. Ct. 1761; *LaRoque v. Holder*, 650 F.3d 777, 792–93 (D.C. Cir. 2011) (holding that a plaintiff not directly subject to an enforcement proceeding could bring a constitutional challenge under *Free Enterprise Fund*).   And here, Plaintiffs are challenging the Commission's actions implementing and enforcing FOIA and processing their FOIA requests—under "Article II of the U.S. Constitution" and "Separation of Powers." Docket No. 1, Count I.

Article II, moreover, does not distinguish between "enforcement" authority and other types of executive power exercised by the President.  *See* U.S. CONST. art. II, § 1, cl. 1.   Rather, "[i]nterpreting a law enacted by Congress to implement the legislative mandate"—similar to the power challenged here—"is the very essence of 'execution' of the law."  *Bowsher*, 478 U.S. at 732–33.  All forms of executive power require presidential oversight, and in all cases, unaccountable executive power unlawfully infringes on the rights of those subject to executive action.  *See Collins*, 141 S. Ct. at 1784.  As the Supreme Court held in *Collins*, "[t]hese purposes [for presidential removal] are implicated whenever an agency does important work, and nothing about the size or role of the FHFA convinces us that its Director should be treated differently from the Director of the CFPB."  *Id.*

Finally, the type of harm faced by the plaintiffs in *Free Enterprise Fund* is no different from the type of harm alleged by Plaintiffs here.  Both groups of plaintiffs

are subject to governmental action by executive officials who are not properly accountable to the President. *See Free Enter. Fund*, 561 U.S. at 485. In *Free Enterprise Fund*, the plaintiffs were firms whose right to operate an accounting business was subject to the Board's regulations and decisions governing the accounting industry. *See id.* at 488. Plaintiffs here are organizations whose right to obtain information through FOIA—a right essential to their operations—is subject to the Commission's regulations and decisions governing FOIA requests. *See* Docket No. 14-1, Exs. O–T.[8] Both groups have a right to ensure that these regulations and decisions are issued by officials who answer to the President. *See Free Enter. Fund*, 561 U.S. at 513; *see also Collins*, 141 S. Ct. at 1780; *cf. Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.").

Accordingly, Plaintiffs have alleged a private right of action entitling them to declaratory relief.

---

[8] Here, since Plaintiffs rely "'heavily and frequently on FOIA' to conduct work that is 'essential to the performance of certain of their primary institutional activities,'" the Commission's FOIA regulations affect the Plaintiffs' "'daily conduct and decision-making.'" *See Payne Enterprises*, 837 F.2d at 494 (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986)). This is significant because the right to information under FOIA is a statutory right of the Plaintiffs. *See Maloney*, 984 F.3d at 59 ("The agency's failure to provide information to which the Requesters are statutorily entitled is a quintessential form of concrete and particularized injury within the meaning of Article III."); *Ctr. for Biological Diversity, Inc.*, 704 F.3d at 429–30 (same). Thus, by regulating and processing FOIA requests, the Commission's regulatory power is acting directly on the rights of the Plaintiffs without Article II oversight.

**2.**

The Government also argues that declaratory relief "would not remedy [Plaintiffs'] injuries" because it would not "vacate the Final Rule" or "undo any decision of the FOIA Office."  Docket No. 24 at 31.  But Plaintiffs seek prospective relief from the Commission's ongoing processing of their FOIA requests without proper presidential oversight.  *See* Docket No. 1 ¶ 54; *see also supra* Sections II.A, IV.B.1.  A declaration stating that the removal restriction in 15 U.S.C. § 2053(a) is unconstitutional would "ensure that [the Commission's actions] to which [Plaintiffs] are subject will be enforced only by a constitutional agency accountable to the Executive."  *Free Enter. Fund*, 561 U.S. at 513.  The declaration would clarify the President's power under Article II to remove commissioners at will.  *See id*.  And it would remove any commissioner's self-perceived job security that might cause him to resist presidential oversight.  *See Bowsher*, 478 U.S. at 728 n.5 (noting that officers' "presumed desire to avoid removal" creates "subservience" to a branch of government (quoting *Synar v. United States*, 626 F. Supp. 1374, 1392 (D.D.C. 1986) (per curiam))).

\*     \*     \*

The Court therefore holds that Plaintiffs are entitled to a declaratory judgment that the removal restriction in 15 U.S.C. § 2053(a) violates Article II of the Constitution.

**V.**

Plaintiffs request a partial final judgment on the declaratory relief sought in Count I to "tee up the constitutional removal question for immediate appeal."  Docket No. 14 at 26.

Federal Rule of Civil Procedure 54(b) provides that, "[w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  FED. R. CIV. P. 54(b).  Thus, the Court must determine (1) whether there is "more than one claim for relief" and (2) whether there is any "just reason for delay."  *Samaad v. City of Dallas*, 940 F.2d 925, 930 (5th Cir. 1991), *abrogated on other grounds by Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 728 (2010).

The parties do not dispute that Count I is an independent claim and that declaring the removal restriction unconstitutional is an "ultimate disposition" of that claim.  *Briargrove Shopping Ctr. Joint Venture v. Pilgrim Enters., Inc.*, 170 F.3d 536, 539 (5th Cir. 1999); *Texas v. United States*, 352 F. Supp. 3d 665, 671 (N.D. Tex. 2018), *aff'd in part, vacated in part on other grounds, remanded*, 945 F.3d 355 (5th Cir. 2019), *as revised* (Dec. 20, 2019), *as revised* (Jan. 9, 2020), *rev'd and remanded sub nom. California v. Texas*, 141 S. Ct. 2104 (2021).  Indeed, Count I seeks declaratory relief under Article II of the Constitution, whereas Counts II and III seek to set aside the Final Rule and the FOIA determinations under the APA and FOIA, respectively. And the declaratory judgment sought by Plaintiffs on Count I fully remedies their ongoing constitutional injury.  *See Free Enter. Fund*, 561 U.S. at 513.

There is also no just reason for delay.  In making that determination, the Court considers both "judicial administrative interests as well as the equities involved."

36

*Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980).  This includes balancing the "danger of hardship or injustice through delay, which would be alleviated by immediate appeal," with the benefit of "avoiding piecemeal appeals."  *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 740 (5th Cir. 2000) (cleaned up) (quoting *PYCA Indus., Inc. v. Harrison Cnty. Waste Water Mgmt. Dist.*, 81 F.3d 1412, 1421 (5th Cir. 1996)).  Here, all three Counts assert that the removal restriction in 15 U.S.C. § 2053(a) is unconstitutional.  But Counts II and III require addressing additional complex and novel questions about the appropriate relief.  *See* Docket No. 1 ¶¶ 67, 77–78 (seeking to have the Final Rule and the Commission's decisions to deny Plaintiffs' FOIA requests "set aside"); *see also supra* note 6.

By entering final judgment on Count I, the Court allows the parties to immediately appeal the constitutional question and potentially avoid the time and resources necessary to address Counts II and III.  *See, e.g.*, 10 CHARLES ALLEN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2659 (4th ed. 2014) ("[A]n early appeal may avoid the need for further proceedings in the district court or may ease significantly the difficulty and complexity of conducting the trial of the unadjudicated claims, thereby supporting immediate review.  This may be true, for example, if the appeal will allow the court to rule on some novel or complex issue that will recur in the trial court." (footnotes omitted)).  In fact, the Government does not dispute this point, arguing instead that Plaintiffs' claims may be mooted as the Commission processes their FOIA requests.  Docket No. 24 at 32–33.  But Plaintiffs have demonstrated they are repeat-FOIA requesters

and will continue to suffer ongoing injury until a declaratory judgment is entered. *See supra* Section II.B.

Accordingly, Plaintiffs' motion for partial final judgment as to Count I is **GRANTED**.

## VI.

In light of the foregoing, the Court resolves the pending motions as follows:

The Government's Motion to Dismiss (Docket No. 24) is **DENIED** in part. The motion is denied to the extent it seeks dismissal of the complaint for lack of standing, failure to state a meritorious separation-of-powers claim, and failure to state a claim for relief for Count I under *Collins v. Yellen*. The Court reserves ruling on whether Plaintiffs have stated a claim for retrospective relief under *Collins*, which they seek under Counts II and III only. Other than this issue relating to Counts II and III, the Court's ruling resolves the remainder of the motion.

Plaintiffs' Motion for Partial Summary Judgment as to Count I and Entry of Partial Final Judgment Under Rule 54(b) (Docket No. 14) is **GRANTED**. The Court holds that (1) the removal restriction in 15 U.S.C. § 2053(b) violates Article II of the Constitution; (2) Plaintiffs are entitled to declaratory judgment to ensure that future FOIA requests are administered by a Commission accountable to the President; and (3) a partial final judgment as to Count I is proper under Rule 54(b).

Finally, the Court sets this matter for a telephonic status conference. Information will be provided in a separate order.

So **ORDERED** and **SIGNED** this **18th** day of **March, 2022.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE